In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

**NO. 09-13-00069-CV**
_____

**MILLET HARRISON JR., Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 252nd District Court**
**Jefferson County, Texas**
**Trial Cause No. 94-66306**

## MEMORANDUM OPINION

In 1994, Millet Harrison Jr. was found not guilty by reason of insanity for the murder of his mother and was committed to a mental health facility. *See Harrison v. State,* 179 S.W.3d 629, 631 (Tex. App.—Beaumont 2005, pet. denied). The trial court has renewed Harrison's commitment each year. *Id.* In January 2013, the trial court again entered an order of commitment continuing Harrison's in-patient mental health services. In two appellate issues, Harrison challenges the legal and factual sufficiency of the evidence to support the trial court's order

1

extending Harrison's in-patient mental health treatment. We affirm the trial court's judgment.

Under a legal sufficiency review when the burden of proof is clear and convincing, we consider all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *Id.* at 634. We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could. *Id*. Under a factual sufficiency review, we consider all the evidence, both in support of and contrary to the trial court's findings, and we give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *Id*. at 634-35. We must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the allegations. *Id*. at 635. We consider whether disputed evidence is such that a reasonable trier of fact could not have reconciled that disputed evidence in favor of its finding. *Id*.

Dr. George Howland, a staff psychiatrist at Rusk State Hospital ("Rusk") and Harrison's treating psychiatrist since March 2012, testified that Harrison suffers from schizophrenia chronic paranoid-type that will continue for a period of at least ninety days. Harrison told Howland that the drug Ambien had caused him to become psychotic. Howland explained that some patients become psychotic

when using Ambien because psychosis is a potential side effect of Ambien. Harrison also told Howland that he had been drugged in the past and believed that this contributed to him becoming psychotic. Howland supposed this could be possible or could be a delusional thought.

Howland was unaware that in January 2012, Harrison had arguments with Rusk staff members, had feelings of being persecuted by the staff, and believed the staff to be placing false information in his medical records. Howland was also unaware that in February 2012, Harrison attempted to have information on his identification card changed. Howland testified that in June 2012, Harrison was still having paranoid thoughts even while taking medication and was having delusions about the origin of his illness. However, Howland testified that Harrison was not currently voicing suicidal or homicidal thoughts, had not been paranoid, had not heard voices or seen things, had complied with Howland's treatment regimen, has a client worker job, participates in ward government, and has improved since he first began seeing Howland. He testified that Harrison had not been physically or verbally aggressive, shown signs of psychosis, or been involved in altercations. Howland testified that Harrison is a role model for other patients.

Howland was unaware that Harrison wanted to stop his medications in September 2011 to show he is no longer mentally ill or that Harrison had refused

medical treatment in October and November 2012. Howland opined that, if left untreated, Harrison will grow worse and become likely to cause harm to himself or others, continue suffering from abnormal, mental, emotional, or physical distress, and continue experiencing deterioration of his ability to function independently. However, Howland testified he looks at how a patient is doing in the present. He testified that Harrison was currently taking his medications and had not refused his psychotropic medications. He explained that Harrison knows he has a mental illness and needs medication, and Howland believed that Harrison would continue taking his medication if released into the community. Howland did not believe that Harrison was malingering, as it would be difficult for a person having persistent delusions to fake normalcy over a period of time. He testified that Harrison needed a place with structure to help him transition, make his psychiatric appointments, and comply with medication. Although Howland believed this type of out-patient setting would be appropriate for Harrison, he admitted that Harrison may possibly stop taking his medication someday and have delusional or paranoid schizophrenic thoughts.

Dr. Dan Roberts, a clinical psychologist, testified that Harrison is a paranoid schizophrenic and, if not treated, is likely to cause harm to himself or others, continue suffering from abnormal mental, emotional, or physical distress, and

4

continue experiencing deterioration of his ability to function independently. Roberts testified that Harrison has a history of periods of delusional thinking followed by periods of calm. Roberts testified that in December 2011 the Rusk treatment team recommended that Harrison remain hospitalized. Medical records indicated that in January 2012, Harrison felt persecuted by the Rusk staff, believed the staff to be falsifying his records, cursed at another patient, and had impaired insight. In February 2012, Harrison received permission to leave Rusk to obtain an identification card, but attempted to persuade his driver to take him other places. Roberts admitted that Harrison was able to function well enough in society to obtain the card. In March 2012, Harrison claimed to have been stable since 1995. Roberts testified that Harrison's records also show that in 2012, Harrison believed that his illness originated from the use of Ambien. In April 2012, Harrison's treatment team asked him to consider the possibility that his illness developed naturally. In June 2012, Harrison still had fixed delusions about the origin of his mental illness. In July 2012, Harrison expressed persecutory thoughts about the trial judge, district attorney, and court system. Thus, Roberts testified that the medical records indicate that Harrison has had delusions after March 2012.

Roberts spoke with Harrison the day before the hearing, during which Harrison stated that he had been told by others that the trial judge and the district

attorney were members of the Ku Klux Klan. Roberts testified that Harrison had previously asserted that the trial judge and district attorney were members of the Klan. Roberts believed that Harrison was attempting to provide an explanation for his prior statements. He noted that in the past Harrison had made comments that he needed to learn what was necessary to say to obtain release from Rusk. Harrison also told Roberts he still believes he was drugged in the past, that the drugs caused hallucinations that are responsible for his mother's death, and that Ambien caused his schizophrenia. Roberts testified that Harrison's medical records do not substantiate Harrison's claim that he previously underwent a drug screen that proved he had been drugged. Yet, Harrison told Roberts that, even during stable periods, he still felt that he had been drugged or poisoned. Roberts admitted that Ambien may precipitate a psychotic episode, but not schizophrenia. Harrison told Roberts he has been stable for over thirty years.

Harrison also told Roberts that he listened to the voices telling him to kill his mother because she was old and sick and that "he probably shouldn't decide to send anyone to heaven and should leave that up to God." Roberts testified that Harrison's statement conflicted with his previous comments to police that he killed his mother because she was possessed by the devil. Roberts testified that this statement also sounded delusional because it implies that Harrison still sees

6

himself as "God's right hand[.]" Roberts admitted that Harrison was articulate and calm during the interview, but was guarded. Roberts testified that Harrison's various beliefs indicate that he is delusional.

Roberts opined that Harrison needs in-patient treatment. He explained that schizophrenia cannot be cured, can last for at least ninety days, and is likely to last forever. Roberts believed that Harrison will likely stop taking his medication, which had previously resulted in Harrison becoming aggressive and killing someone. He testified that Harrison's previous violent episodes were accompanied by religious delusions. Roberts explained that Harrison had been trying to stop taking his medication for twenty years, and that his pattern had been to do well for a period of time and take his medication and to then not do well. He testified that the records demonstrate Harrison wanted to stop taking his medication in September 2011 to show that he is no longer mentally ill. Roberts testified that when Harrison was taken off his medication, he became psychotic within two weeks. Roberts admitted that Harrison had demonstrated an ability to function in society to a degree, but testified that Harrison is a continued danger to others as long as he has paranoid delusions that have been resistant to treatment. Roberts did not believe that Harrison had sufficient insight into his illness to be released or was

capable of making a rational, informed decision about submitting to treatment on an out-patient basis.

Allison Geroux, a social worker at Rusk, testified that out-patient treatment would include psychiatric care, meals, shelter, and some supervision. Geroux confirmed that someone would be present to watch Harrison take his medication. She testified that Harrison would be able to come and go, but would be on a curfew. According to Geroux, Harrison is on a residential unit at Rusk, which remains unlocked during the day, and Harrison can come and go, but has never left Rusk even though he is able to do so. Geroux testified that an out-patient setting would be similar to Rusk, but in the community with additional freedoms. Geroux admitted that (1) the Rusk treatment team had recommended continued hospitalization in December 2011; (2) in April 2012 the team recommended that Harrison consider that his illness was not the result of being drugged or taking Ambien; and (3) in June 2012 the team believed that Harrison was having fixed delusions regarding his illness. Geroux testified that Harrison had expressed his belief that no matter what he does, he will not be released from Rusk.

Terry Arnold, a psychologist at Rusk, testified that Harrison has been very receptive to her suggestion that he consider his illness to be the result of a normal process and has not recently engaged in any delusional thinking. She explained that

8

it is not delusional for Harrison to believe he will not be released even though he has done everything required of him. Arnold testified that Harrison's medication was previously reduced at Harrison's request because of side effects, but the dosage had to be increased about a month later because Harrison became paranoid on the lower dose. Arnold believed that because of Harrison's education on the benefits of his medication, Harrison would not stop taking his medication. She believed that Harrison can be managed in a less restrictive environment and has insight into his illness.

Isaac Randall, Harrison's friend and brother-in-law, testified that Harrison is ready to be reintegrated into the community. Randall opined that Harrison is not a danger and testified that Harrison could live with him or another relative. He testified that Harrison is not a violent person or a threat to anyone, and he explained that Harrison's troubles began when a new doctor changed his medication. Randall admitted that Harrison needs to take medication. He believed that Harrison now understands and has sufficient insight into his condition to realize the need to continue taking his medication or risk being committed again. He testified that whenever Harrison becomes ill, he comes to his family; thus, no one in the public would be harmed should Harrison stop taking his medication.

Randall testified that Harrison could have left Rusk at any time and hurt someone, but that he did not do so.

Michael Herndon, a psychiatric nursing assistant at Rusk, testified that he attended Roberts's interview of Harrison. Herndon did not recall Harrison making any references to the Ku Klux Klan. He did not observe any delusional thinking or inappropriate behavior by Harrison during the interview.

Harrison testified that he was told by others that the trial judge may be a member of the Ku Klux Klan and that he merely repeated what others had told him. He denied ever claiming he did not have a mental illness, testified that the only time he did not take his medication was under a doctor's orders, and explained that he believed the Ambien led to hearing voices, not to his mental illness. According to Harrison, he no longer heard voices after discontinuing the Ambien, but the voices returned when he would use Ambien. Harrison admitted telling Roberts that he had been drugged in the past, which led to the development of his mental illness. Regarding changes made to his identification card, Harrison explained that the card contained incorrect information that needed to be changed and that other patients' cards were changed as well. He also explained that, during other trips away from Rusk, his driver had taken him other places.

Harrison testified that his symptoms had been in remission and, based on this fact, he had previously stated that he had possibly been cured. He testified that he had once asked his doctor to see how he responded without medication because he wanted to show his attorney how he reacted to the lack of medication. He also testified that he has a slight tremor as a side effect of his medication, but the reason he had attempted to have his medication reduced is because he began having confused thinking when on the higher dosage. Harrison testified that he would remain on his medications if released.

On appeal, Harrison contends that the nature of his crime influenced the trial court's decision to continue his in-patient commitment, rather than the evidence. He further contends that the trial court relied on the mere possibility that Harrison could pose a danger upon release. According to Harrison, the evidence demonstrates that he has improved such that he is now suitable for release and does not support a conclusion that his condition is expected to continue for more than ninety days.

A trial court may order extended in-patient mental health services only if it finds, from clear and convincing evidence, that the proposed patient is mentally ill, the condition is expected to continue for more than ninety days, and the patient has received court-ordered in-patient mental health services for at least sixty

consecutive days during the preceding twelve months. Act of April 29, 1991, 72nd Leg., R.S., ch. 76, § 1, 1991 Tex. Gen. Laws 515, 589 (amended 1995, 1997, 1999, 2003, 2011) (current version at Tex. Health & Safety Code Ann. § 574.035(a) (West Supp. 2012)). The patient must (1) be likely to cause serious harm to himself or others; or (2) if not treated, continue to suffer severe and abnormal mental, emotional, or physical distress, continue to experience deterioration of his ability to function independently, and be unable to make a rational and informed decision as to whether or not to submit to treatment. *Id*. To be clear and convincing, the State must present expert testimony and evidence of a recent overt act or a continuing pattern of behavior that tends to confirm: (1) the likelihood of serious harm to the proposed patient or others; or (2) the proposed patient's distress and the deterioration of his ability to function. *See id*. (current version at Tex. Health & Safety Code Ann. § 574.035(e) (West Supp. 2012)). In this case, the trial court found that Harrison is mentally ill and is likely to cause serious harm to himself or others or, if not treated, will continue to suffer severe and abnormal mental, emotional, or physical distress, to experience deterioration of his ability to function independently, and be unable to make a rational and informed decision as to whether or not to submit to treatment.

It is undisputed that Harrison suffers from chronic paranoid schizophrenia, a mental illness for which medication is required. The record demonstrates that Harrison's illness is expected to continue for at least ninety days and that Harrison has received court-ordered in-patient mental health services for at least sixty consecutive days during the preceding twelve months. Both Howland and Roberts agreed that, if untreated, Harrison will likely cause harm to himself or others, continue suffering from abnormal mental, emotional, or physical distress, and continue experiencing deterioration of his ability to function independently. Additionally, the record demonstrates that Harrison has a history of stable periods followed by unstable periods, beliefs that his illness originated from causes other than natural progression, beliefs that his illness is cured, beliefs that he has been stable for years, and has a history of inconsistently taking his medication. Howland and Arnold testified that Harrison was compliant with his treatment regimen and had not been aggressive, paranoid, or delusional. They believed that Harrison would continue taking his medication in an out-patient setting and recommended out-patient treatment.

Roberts, however, did not believe that Harrison had sufficient insight into his illness to be released on an out-patient basis or to make rational, informed decisions about submitting to treatment on an out-patient basis. The trial court

heard evidence that when Harrison is not taking his medication, he becomes psychotic and aggressive. Within the last twelve months, Harrison had arguments with staff members, delusional beliefs, and paranoid thoughts even though he was taking medication. Also within the last twelve months, Harrison refused medical treatment, claimed to have been stable for many years, and continued expressing delusional beliefs regarding the court system and the origin of his illness. Roberts also testified that Harrison had previously sought to have his medication decreased or discontinued and had expressed the need to learn what to say to be released from Rusk.

When making its decision, the trial court was permitted to consider the consequences of removing Harrison from the safety of his structured environment at Rusk. *See State ex rel. T.H.*, 194 S.W.3d 82, 88 (Tex. App.—El Paso 2006, no pet.); *see also Weller v. State*, 273 S.W.3d 350, 353 (Tex. App.—Beaumont 2008, no pet.) (A patient's refusal to take medication tends to confirm the likelihood of serious harm to the patient and others, and the patient's original crime may indicate the extent to which he can be a danger to others if he does not control his mental illness.). Moreover, as factfinder, the trial court was required to determine which testimony to accept as credible. *See Harrison*, 179 S.W.3d at 635. In doing so, the trial court could reasonably have formed a firm belief or conviction that Harrison

14

continues to meet the in-patient criteria for involuntary commitment. *See id*. at 638.

Because the evidence is legally and factually sufficient to support the trial court's

findings, we overrule Harrison's two issues and affirm the trial court's judgment.

AFFIRMED.

_____
STEVE McKEITHEN
Chief Justice

Submitted on July 12, 2013
Opinion Delivered September 5, 2013
Before McKeithen, C.J., Kreger and Horton, JJ.

15